UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Ricardo Azana, *et al.*,<br>        *Plaintiffs*,<br><br>            *v.*<br><br>City of West Haven, *et al.*,<br>        *Defendant.* | Civil No. 3:10cv883 (JBA)<br><br><br>January 27, 2012 |

RULING ON MOTION FOR SUMMARY JUDGMENT

On January 24, 2011, Plaintiffs Ricardo Azana, Yamileidi Azana, and minor child R.A. filed a Second Amended Complaint against Defendants the City of West Haven ("City"); West Haven Police Officers Brian Bogert, Scott Bloom, Debra D'Amato, and Michael Wolf; West Haven Police Sergeant Ronald Celentano; and West Haven Police Chief John Karajanis. Plaintiffs allege that Defendants violated their Fourth and Fourteenth Amendment rights and their rights under Article First, §§ 8 and 9 of the Connecticut Constitution, and are also liable to Plaintiffs for assault and battery, recklessness and maliciousness, negligence, negligent infliction of emotional distress, intentional infliction of emotional distress, and municipal liability under Conn. Gen. Stat. § 52-557n. Defendants move [Doc. # 60] for summary judgment on August 12, 2011. For the reasons that follow, Defendants' motion will be granted in part and denied in part.

I.      Relevant Facts

On the morning of October 25, 2009, Officers Bogert and Morse were dispatched to the area of William Street and Washington Avenue in West Haven, Connecticut on an anonymous report of a loud party. (Bogert Aff. [Doc. # 60–1] ¶ 8; Morse Aff. [Doc. # 62–1] ¶ 5.) Officers Bogert and Morse state in their affidavits that they arrived at the vicinity of

William Street and Washington Avenue, exited their patrol vehicles, and "could hear loud music coming from the open windows of the second floor apartment of 143–145 William Street." (Bogert Aff. ¶ 9; Morse Aff. ¶¶ 6–7.) Ricardo and Yamileidi Azana deny that loud music was playing from their apartment at the time the officers arrived. (Ricardo Azana Aff. [Doc. # 69–1] ¶ 13; Yamileidi Azana Aff. [Doc. # 69–5] ¶ 13.) The officers walked to the front porch at 143–145 William Street; they state in their affidavits that they then knocked on the screen door, however Ricardo and Yamileidi Azana deny that the officers knocked. (Bogert Aff. ¶ 14; Morse Aff. ¶ 12; Ricardo Azana Aff. ¶ 11.)

The porch at 143–145 William Street has two front doors and three mailboxes; the front entrance to 145 William Street consists of a set of stairs with a 90–degree turn that lead to a second floor landing which cannot be seen from the front door. (Bogert Aff ¶ 12; Ex. B to Bogert Aff.; Morse Aff. ¶¶ 9–10; Ricardo Azana Aff. ¶ 7.) Photographs of the porch show two doors; the number "145" on a post on the left side of the porch and "143" on a post on the right side; one mailbox to the left of the left door, one in between the doors, and one to the right of the right door; and only one doorbell to the left of each door. (Ex. B to Bogert Aff.) Officers Bogert and Morse entered the door to 145 William Street and walked up to the second floor landing. (Bogert Aff ¶¶ 14–15; Morse Aff. ¶¶ 12–13.) They state that the inside door to the Azana's apartment on the second floor landing "was wide open," that they observed 10 males in the living room area inside the apartment along with several cases of beer, and that after asking if the tenant or owner was home, they spoke with Yamileidi Azana and asked her for identification. (Bogert Aff. ¶¶ 15–18; Morse Aff. ¶¶ 13–16.) Plaintiffs deny this account, and point out that Yamileidi Azana could not have identified herself and

spoken with the officers because she does not speak English.  (Ricardo Azana Aff. ¶¶ 11–12; Yamileidi Azana Aff. ¶¶ 14–16.)

Ricardo Azana approached the officers; they suggest in their affidavits that they were still outside the apartment when Mr. Azana approached them, however Mr. Azana claims that they were already in the apartment at this time.  (Bogert Aff. ¶ 20; Morse Aff. ¶ 18; Ricardo Azana ¶ 12.)  The officers state that Mr. Azana "appeared to be intoxicated" and was agitated by their presence (Bogert Aff. ¶ 20; Morse Aff. ¶ 18); Ms. Azana denies that Ricardo Azana was intoxicated or agitated (Yamileidi Azana ¶ 11), however he testified during his deposition that he did drink beer at the party in his apartment that evening (Ricardo Azana Dep., Ex. C to Mahar Aff. [Doc. # 60–4] at 36:11–15).  Officer Bogert explained to Mr. Azana that they received a complaint about the loud music; the officers state that Mr. Azana then began arguing with them, which Mr. Azana denies.  (Bogert Aff. ¶¶ 21–22; Morse Aff. ¶¶ 19–21; Ricardo Azana Aff. ¶¶ 13–16.)

The officers aver that Mr. Azana continued to argue with them, at which point Officer Bogert advised him that he was under arrest and asked him to step outside the apartment; Mr. Azana refused and Bogert reached into the apartment and placed his right hand on Mr. Azana's wrist to take him into custody.  (Bogert Aff. ¶¶ 22–25; Morse Aff. ¶¶ 20–23.)  The officers further state that Mr. Azana jerked his arm back, pulling Officer Bogert into the living room, at which point the person standing next to Mr. Azana, later identified as Marco Valdivia, pushed Officer Bogert backwards.  (Bogert Aff. ¶¶ 26–28; Morse Aff. ¶¶ 24–25.)  Officer Morse states that he followed Officer Bogert into the living room and the men in the living room began pushing the officers and throwing food and beer bottles at them, at which point he called for backup.  (Morse Aff. ¶¶ 25–26.)  Morse also

avers: "At some point, I made a second call over the radio to have back up officers 'step it up,' which means for the responding officers to get to the location as fast as they safely can." (*Id.* ¶ 27.)

Mr. Azana denies this version of the events in its entirety.  He claims that there was no music playing at the time of the encounter with the officers, that the officers were already in his apartment by the time he spoke with them, that he was neither intoxicated nor agitated, that he was never asked to step outside the apartment, and that the first physical contact between the officers and him occurred when one of the officers punched him in the face.  (Ricardo Azana Aff. ¶¶ 10–18.)

Officers Bogert and Morse state in their affidavits that Mr. Azana fled to a bedroom and "attempted to lock himself in."  (Bogert Aff. ¶¶ 30–31; Morse Aff. ¶¶ 27–28.)  They state that they followed him, and concerned that he might have a weapon in the bedroom, forced the bedroom door open.  (Bogert Aff. ¶¶ 31–32; Morse Aff. ¶¶ 28–29.)  Mr. Azana states in his affidavit that "I feared for my life, so I ran to my bedroom."  (Ricardo Azana Aff. ¶ 19.)  He claims that his son was sleeping in his bed and began crying when the officers kicked down the door, so he picked him up "because he came into my arms."  (*Id.* ¶¶ 29–10; Ricardo Azana Dep. at 119:20–120:8.)  The officers state in their affidavits that it appeared he was using his son as a shield (Bogert Aff. ¶ 34; Morse Aff. ¶ 29), which Mr. Azana denies (Ricardo Azana Dep. at 119:20–22).

Officer Bogert states in his affidavit "[a]fter a brief struggle with Mr. Azana, I was able to place him into double lock handcuffs, while Officer Morse fended off hostile parties who were attempting to enter the bedroom" (Bogert Aff. ¶ 36), while Officer Morse avers that he assisted Officer Bogert in restraining Mr. Azana by grabbing him "by one of his arms

in order to get his hands behind his back" (Morse Aff. ¶ 30). Mr. Azana describes the events differently, stating in his affidavit that one of the officers "forcefully grabbed" his son and "threw him on the bed," and that the officers used "bad language" and told him: "Shut up, you stupid illegal immigrant.   I'm going to call immigration."   (Ricardo Azana Aff. ¶¶ 21–22.) Mr. Azana further claims that the officers beat him "all over my shoulders, back, and arms . . . with a baton and with their fists," while he was covering himself and pleading with them to stop.   (*Id.* ¶¶ 23–24.)   He attaches to his affidavit several photographs, revealing contusions on his back, arm, and face.   (*See* Ex. B to Ricardo Azana Aff.)   Ms. Azana also states in her affidavit that she saw the officers throw her son forcefully onto the bed, saw the officers beat her husband, and heard the officers telling Mr. Azana "Shut up, Shut up, stupid." (Yamileidi Azana Aff. ¶¶ 21–26.)   Officer Bogert claims that at no time during the incident did he punch Mr. Azana in the face, strike him with his baton or any other object, strike any other people with his baton, use derogatory language about Hispanic people or Spanish speaking people, or hear any other police officers use such language.   (Bogert Aff. ¶¶ 40–44.)   Officer Morse similarly claims that he did not punch or kick Mr. Azana, strike him with his baton or any other object, strike any other people in the apartment, use derogatory language, or hear any other officers use derogatory language.   (Morse Aff. ¶¶ 34–38.)

According to Officers Bogert and Morse, backup officers began to arrive after they secured Mr. Azana and were escorting him from the bedroom.   (Bogert Aff. ¶¶ 37–39; Morse Aff. ¶¶ 32–33.)   Mr. Azana, however, claims that "another 20 or 30 police" entered his house while he was being beaten, "looked in all the closets in my apartment, under the bed, everywhere," and were "right outside my bedroom door when I was being beaten."   (Ricardo

Azana Aff. ¶¶ 25–26.)  Ms. Azana similarly claims that "[t]here were probably at least five police in my bedroom, looking under my mattress, in the closet, and in my drawers," that they "could've stopped the other officers from beat[ing] my husband, but they didn't," and that while the officers beat Mr. Azana "other officers were in the room, searching through the room." (Yamileidi Azana Aff. ¶¶ 23–26.)

Officers Bloom, D'Amato, and Wolf and Sergeant Celentano (the "back–up officers") state in their affidavits that shortly after 1:00 a.m. on the morning of October 25, 2009 they responded to an "Officers Need Assistance" call at 143–145 William Street.  (Bloom Aff. [Doc. # 62–2] ¶ 5; D'Amato Aff. [Doc. # 62–3] ¶ 5; Wolf Aff. [Doc. # 62–4] ¶ 5; Celentano Aff. [Doc. # 63–2] ¶ 5.)  These officers state that they arrived at Mr. Azana's apartment after he had been arrested, and that they did not strike anyone or use any derogatory language about Hispanic or Spanish–speaking people.  (Bloom Aff. ¶¶ 7–17; D'Amato Aff. ¶¶ 7–15; Wolf Aff. ¶¶ 7–15; Celentano Aff. ¶¶ 6–15.)  Officer Bloom avers that when he arrived at the vicinity of Williams Street and Washington Avenue, "there was a commotion on the second floor apartment of 143–145 William Street . . . [and] I believed that an emergency existed and that the officers who had called for help were in trouble." (Bloom Aff. ¶ 6.)  He further avers, however, that by the time he entered the apartment, "the incident was over for the most part." (*Id.* ¶ 7.)  Officer Bloom was concerned about the safety risk that the wet, slippery floors posed to his canine partner, Onyx, so he left the apartment and went outside. (*Id.* ¶ 9.)

Officers D'Amato and Wolf similarly state in their affidavits that "there was a commotion" when they arrived at the area of Williams Street and Washington Avenue. (D'Amato Aff. ¶6; Wolf Aff. ¶ 6.)  Officer D'Amato further states that the incident was over

for the most part when she entered the apartment (D'Amato Aff. ¶ 7), but Officer Wolf states that when he entered the apartment, "numerous people were pushing [Officers Bogert and Morse] and otherwise interfering with their ability to get out" (Wolf Aff. ¶ 8). Sergeant Celentano states in his affidavit that when he arrived at the area of Williams Street and Washington Avenue, "the incident was already over with numerous people under arrest." (Celentano Aff. ¶ 6.)

Officer Bogert states in his affidavit that he made an oral report to the Department of Children and Families, as well as a written report because "[b]ased on Mr. Azana's conduct of holding his child in an apparent attempt to prevent his arrest, as well as the totality of the circumstances at the time of the incident," he felt he "was required by statute." (Bogert Aff. ¶ 48.) Mr. Azana's affidavit states that on three occasions after the incident, the Department of Children and Families ("DCF") came to his house with an interpreter, asked him and Yamileidi Azana questions about their son, "checked" the entire house, and administered drug tests to Mr. Azana. (Ricardo Azana Aff. ¶¶ 33–34.) Mr. Azana further states: "My neighbors and other family members knew that DCF came to my house. It made me feel badly and intimidated with fear because to my understanding DCF is for children who are abused by parents. Those several visits were enough to traumatize me, just by the thought of DCF taking my son." (*Id.* ¶ 36.)

II.    Discussion[1]

Officer Bogert moves for summary judgment as Count Two (false arrest) and Count Four (equal protection), and moves for partial summary judgment as to Count One (warrantless entry), Count Seven (recklessness and maliciousness), Count Eight (negligence), Count Nine (negligent infliction of emotional distress), and Count Ten (IIED). Officers Wolf, Bloom, and D'Amato, and Sergeant Celentano ("back–up officers") move for summary judgment as to Counts One through Ten. Chief Karajanis moves for summary judgment as to Count Eleven (Monell claim) and the City moves for summary judgment as to Counts Eleven and Twelve (Conn. Gen. Stat. § 52-557n).

A.    Count One: Warrantless Entry

i.    *Officer Bogert*

Officer Bogert moves for summary judgment on Plaintiffs' Fourth Amendment warrantless entry claim only with respect to the portion of Count One that concerns his opening the screen door at 145 William Street and proceeding up the stairs to the second floor landing without a warrant. He argues that he is entitled to qualified immunity as to this portion of Count One "because it was objectively reasonable for him to believe that this was a common stairway leading to the second and third floor apartments." (Mem. Supp.

---

[1] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

[Doc. # 60–2] at 14.)   Plaintiffs argue that Officer Bogert is not entitled to qualified immunity with respect to these portions of their warrantless entry claim because there are genuine issues of fact as to whether Officers Bogert and Morse knocked or otherwise announced themselves and an issue as to whether the officers could have reasonably believed that Plaintiffs' front door belonged to a common hall or lobby.   (Opp'n [Doc. # 69] at 8.)

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The two–pronged qualified–immunity inquiry asks whether "the facts alleged show the officer's conduct violated a constitutional right," and if so, "whether the right was clearly established," such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001).   The analysis may take place in any order "in light of the circumstances in the particular case at hand," *Pearson*, 555 U.S. at 236, so long as the immunity questions are resolved "at the earliest possible stage in litigation," *id.* at 232.   Thus, qualified immunity  protects a defendant if "(1) his conduct does not violate a clearly established constitutional right, or (2) it was 'objectively reasonable' for the officer to believe his conduct did not violate a clearly established constitutional right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (citations omitted).

The Fourth Amendment protects an individual's privacy "when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York*, 445 U.S. 573, 589 (1980).   However, common halls and lobbies of multi–tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors."

*United States v. Holland*, 755 F.2d 253, 255 (2d Cir. 1985) (reversing district court's order that appellee's warrantless arrest was "inside his home" where he was arrested in the common hallway on the ground floor of his apartment building). Officer Bogert argues that because there are three mailboxes on the front porch of 143–145 William Street and only two doors, it was reasonable for him to conclude that the stairway he entered was a common area leading to both the second and third floor apartments. (Mem. Supp. at 15.)

However, photographs of the front porch of 143–145 William Street reveal that each door is clearly marked with its own respective address (145 on the left and 143 on the right), and each door had only one doorbell. (*See* Ex. B to Bogert Aff.) These photographs, along with the descriptions of the officers and Mr. and Ms. Azana, do not depict a building comparable to that in *Holland*, where a common hall served separate apartments. Instead, the placement of separate addresses and a single doorbell next to each individual door would suggest to a reasonable officer that each door served a separate individual apartment. That there were two doors, two addresses, and two doorbells belies a reasonable belief that there could have been more than one apartment accessible through the door to 145 William Street. In addition, Officer Bogert's claim that he knocked on the door to 145 William Street prior to opening the door and entering the apartment (Bogert Aff. ¶ 14) is inconsistent with his professed belief that this door served multiple apartment units; if a visitor sought access to one apartment of many off of a common hallway, he or she would not reasonably believe that knocking on the main entrance would cause the resident of one particular unit to answer the door.

These facts in the record that are inconsistent with a reasonable belief that Officers Bogert and Morse entered a common hallway by walking through the exterior door at 145

10

William Street; when viewed in the light most favorable to Plaintiffs, they demonstrate that it was not objectively reasonable for Officer Bogert to believe that by walking through the screen door at 145 William Street he was entering a common hallway. Officer Bogert's motion for summary judgment on qualified immunity with regard to Plaintiffs' warrantless entry claims in Count One is therefore denied.

ii.    *Back–Up Officers*

Officers Wolf, Bloom, D'Amato, and Sergeant Celentano move to dismiss Count One against them in its entirety, arguing that their entry into Plaintiffs' apartment was lawful under the exigent circumstances exception to the warrant requirement or, in the alternative, that it was objectively reasonable for them to believe their entry was legal under this exception and they are therefore entitled to qualified immunity. Plaintiffs argue that there are insufficient facts to warrant summary judgment on exigent circumstances, and that despite the call for back–up, it was not objectively reasonable for the back–up officers to believe their entry was legal.

"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). This "emergency aid" exception provides that "[p]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person whom they reasonably believe to be in distress and in need of that assistance." *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (holding defendant police officer was immune from suit because it was reasonable for him to believe his entry was justified by exigent circumstances in responding to a domestic dispute where he had been trained "to expect violence in many such disputes," he was told it was a "'bad' domestic disturbance," he was informed by

neighbors when he arrived at the residence that "the shouting had ended right before his arrival," and he "heard nothing and found a broken window pane"); *see also Brigham City*, 547 U.S. at 403 ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.")  In determining the reasonableness of an officer's belief as to the existence of exigent circumstances, the Court must apply an objective standard "by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences." *Tierney*, 133 F.3d at 196–97.

In arguing that it was objectively reasonable for Officers Wolf, Bloom, D'Amato, and Sergeant Celentano to believe that their entry was justified by exigent circumstances, Defendants rely on the fact that they were responding to a call of "officers need assistance," which they state in their affidavits is a "high priority call because it indicates that police officers are in trouble and need immediate back–up" (*see, e.g.* Bloom Aff. ¶ 5).  Officer Morse's affidavit states that he called for back–up twice, the second time calling for the back–up officers to "step it up" and get to the scene as fast as the safely could.  (Morse Aff. ¶¶ 26–27.)  Officers Bloom, D'Amato, and Wolf state in their affidavits that when they arrived outside the Azanas' apartment in response to the call for assistance, they heard commotion upstairs and they believed that an emergency existed.  (Bloom Aff. ¶¶ 6–7; D'Amato Aff. ¶¶ 6–7; Wolf Aff. ¶¶ 6–7.)  Given the high priority nature of the "officers need assistance" call and these three officers' observations at the scene, it was objectively reasonable for Officers Bloom, D'Amato, and Wolf to believe that their entry through the front door at 145 William Street was justified by exigent circumstances.  They are therefore

entitled to qualified immunity, and Defendants' motion for summary judgment is granted as to these three officers with respect to this initial entry.

However, after arriving at the landing of the Azanas' apartment, Officers Bloom and D'Amato observed that "the incident was over for the most part." (Bloom Aff. ¶ 7, D'Amato Aff. ¶ 7.) Interpreting this statement in the light most favorable to Plaintiffs, Officers Bloom and D'Amato would not have had an objectively reasonable belief that exigent circumstances justified their further intrusion into the apartment. Thus, they are not entitled to summary judgment on qualified immunity as to their decision to enter the Azanas' living room.

Officer Wolf stated in his affidavit that when he arrived on the landing, "numerous people were pushing [Officers Bogert and Morse] and otherwise interfering with their ability to get out." (Wolf Aff. ¶ 8.) Given the high priority call for back–up and his observations regarding the risks to Officers Bogert and Morse, it was objectively reasonable for Officer Wolf to believe that exigent circumstances warranted his entry into the living room, and he is therefore entitled to qualified immunity with respect to the remaining Fourth Amendment warrantless entry claims against him.

In contrast to the averments of Officers Bloom, D'Amato, and Wolf, Sergeant Celentano stated in his affidavit that when he arrived outside the apartment, "the incident was already over." (Celentano Aff. ¶ 6.) Having observed that the incident was over, it was not objectively reasonable for Sergeant Celentano to believe that exigent circumstances warranted his entry into the apartment. He is therefore not entitled to qualified immunity with respect to Count One.

B.      Count Two: False Arrest

All Defendant–officers move for summary judgment in their favor on Count Two of Plaintiffs' Second Amended Complaint, which alleges false arrest in violation of the Fourth Amendment.  Defendants argue that in order to succeed in his false arrest claim, Plaintiff Ricardo Azana must show that there was a termination of the prosecution against him in his favor, and that because he pled *nolo contendere* to the charge of creating a public disturbance in violation of Conn. Gen. Stat. § 53a-181a and paid a $60 fine, he cannot prove this element and his claim must fail.  The back–up officers also argue that they are entitled to summary judgment on this Count because there is no dispute that Officer Bogert arrested Mr. Azana.  Plaintiff Ricardo Azana argues that his *nolo contendere* plea does not necessarily mean that his criminal prosecution did not terminate in his favor.  He does not respond to the argument that the back–up officers did not participate in the arrest.

Under Connecticut law and Section 1983, to succeed on a false arrest claim a plaintiff must demonstrate that the underlying criminal prosecution terminated in his or her favor. *Roesch v. Otarola*, 980 F.2d 850, 853 (2d Cir. 1992) ("A person who thinks there is not even probable cause to believe he committed the crime with which he is charged must pursue the criminal case to an acquittal or an unqualified dismissal, or else waive his section 1983 claim."); *see Maesse v. Oliver*, 3:06cv1412 (HBF), 2008 WL 1897738, *2 (D. Conn. April 28, 2008); *Brown v. Catania*, 3:06cv73 (PCD), 2007 WL 879081, *4 (D. Conn. March 21, 2007). Courts in this district have found that a *nolo contedere* plea does not qualify as favorable termination for the purposes of a false arrest claim. *See Brown*, 2007 WL 879081 at *5 ("Plaintiff entered a plea of *nolo contendere*, . . . [a]s such, he is unable to claim the required favorable termination and therefore cannot maintain a § 1983 or state law claim for false

14

arrest or false imprisonment."); *see also Greene v. Wright*, 389 F. Supp. 2d 416, 429 (D. Conn. 2005) ("As Mr. Greene pled nolo contendere to charges of 3rd degree assault and 2nd degree unlawful restraint on March 18, 2005, he cannot claim the required favorable termination."); *cf. Maesse*, 2008 WL 1897738 at *3 ("In this case, the dismissal of the criminal charges against Mr. Maesse was conditioned on his plea to the infraction of creating a public disturbance. . . . This arrangement does not satisfy the requirement of a favorable termination as it was clearly conditioned upon plaintiff's agreement to plead to an infraction.")

On December 22, 2009 in Connecticut Superior Court, Mr. Azana entered a plea of *nolo contendere* to charges of creating a public disturbance in violation of Conn. Gen. Stat. § 53a-181a and paid a $60 fine.  (*See* Ex. B to Mahar Aff.)  His counsel contended at oral argument however, that a *nolo contendere* plea is a "plea of convenience" and thus does not necessarily reflect an unfavorable termination.  A "plea of convenience," while it may not be an unfavorable termination, is also not a favorable termination, which Plaintiffs are required to demonstrate in order to succeed on their false arrest claim.  Because a *nolo contendere* plea is not a favorable termination, Defendants' motion for summary judgment as to Count Two is granted.

### C.     Count Three: Excessive Force

The back–up officers—Bloom, D'Amato, Wolf, and Celentano—move for summary judgment on Count Three of the Second Amended Complaint, which alleges excessive force in violation of the Fourth Amendment, on the ground that "there is no dispute that Officers Bloom, D'Amato, Wolf, and Sergeant Celentano were not present when Mr. Azana was arrested and there is no evidence that any of those officers assaulted or otherwise used excessive force against Mr. Azana." (Mem. Supp. at 17–18.)  Officer Bogert does not move

for summary judgment on this count.  Plaintiffs' counsel agreed at oral argument that Defendants' motion for summary judgment on this count should be granted as to Officers Bloom, D'Amato, and Celentano because there is no evidence that they were present during the alleged use of force against Mr. Azana.  Plaintiffs argue that Defendants' motion should be denied as to Officer Wolf, however, because Mr. Azana, during his deposition, described an officer with physical characteristics matching those of Officer Wolf who was present during the alleged beating.

"Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).  Liability for use of excessive force extends not only to those officers who physically apply the force, but can extend to those who stand by and fail to intervene to stop the use of excessive force by a fellow officer: "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers."  *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) (defendant officer "can be found liable for deliberating choosing not to make a reasonable attempt to stop" the use of excessive force by another officer with respect to abuse that he had a "realistic opportunity" to stop).

Ricardo Azana states in his affidavit that police officers were present in the apartment and "right outside my bedroom door when I was being beaten (Ricardo Azana Aff. ¶¶ 25–26).  Yamileidi Azana similarly states in her affidavit that "[t]here were probably at least five police in my bedroom, looking under my mattress, in the closet, and in my

drawers," that they "could've stopped the other officers from beat[ing] my husband, but they didn't," and that while the officers beat Mr. Azana "other officers were in the room, searching through the room." (Yamileidi Azana Aff. ¶¶ 23–26.)  Ricardo Azana testified at his deposition that while Officer Bogert beat him, he saw an officer "right outside" his bedroom door "that almost looked like the one that was hitting me.  He was bald and kind of heavy and tall, but he had, like, a beard—he had like a goatee." (Ricardo Azana Dep. at 67:16–25.)  Defendants' counsel agreed at oral argument that this description fit Officer Wolf at the time of the incident.  If a jury were to credit Mr. Azana's account, it could find that Officer Wolf was present at a time and in a location such that he had a "realistic opportunity" to put an end to the beating that Ricardo Azana alleges he suffered. Defendants' motion for summary judgment as to Count Three with respect to Officer Wolf is therefore denied.

>        D.        Count Four: Equal Protection

All Defendants move for summary judgment in their favor on Count Four of the Second Amended Complaint, which alleges deprivation of Plaintiffs' equal protection rights in violation of the Fourteenth Amendment.  They argue that Plaintiffs' equal protection claim must fail because there is no evidence that the West Haven Police Department treated "similarly situated" individuals of a different race any differently in responding to noise complaints.   Plaintiffs argue that their equal protection claim is supported by evidence of Defendants' use of racial slurs during the incident in question, evidence that West Haven police officers had appeared at the Azanas' apartment on three prior occasions in response to noise complaint, and "that other non–Hispanic families were not arrested for the same noise violations." (Opp'n at 16–19.)  Plaintiffs' counsel acknowledged at oral argument

however, that the records of other incidents responded to by the individual officer Defendants exist "in a vacuum" and do not reveal any information about what happened during the investigations of any other noise complaints.

To successfully demonstrate selective enforcement in violation of the equal protection clause of the Fourteenth Amendment, a plaintiff must show both "(1) that [he or she was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punished the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Doninger v. Niehoff*, 642 F.3d 334, 357 (2d Cir. 2011) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001)).  In order to meet the first prong of this standard at the summary judgment stage, "a plaintiff must present evidence comparing [him or herself] to individuals that are similarly situated in all material respects."  *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 253 (dismissing on summary judgment plaintiffs' claim against town for selectively enforcing permitting ordinances because plaintiffs could not demonstrate similarly situated individuals—other residents who were issued tickets for permitting violations but continued not to comply with the regulations,—who were treated differently, i.e. were not issued subsequent summonses for the continuing violations); *Sebold v. City of Middletown*, No. 3:05cv1205 (AHN), 2007 WL 2782527, *26 (D. Conn. Sept. 21, 2007) (in an employment discrimination selective enforcement action against the City of Middletown, plaintiff could not satisfy her burden on summary judgment of showing individuals similarly situated to her in all material aspects because the employees to whom she compared herself held different positions than she did).

Alone, a claim that a government official enforced or applied a statute or regulation inconsistently is insufficient to meet this burden in the absence of evidence of individuals who are similarly situated in all material respects, but members of a different race, gender, or religion, and were treated differently. *See St. German of Alaska Eastern Orthodox Catholic Church v. United States*, 840 F.2d 1087, 1095 (2d Cir. 1988) (petitioners' statements that other organizations have not been scrutinized by the IRS to the extent that they had been did not satisfy the "similarly situated" requirement); *Kelly v. Rice*, 375 F. Supp. 2d 203, 210 (S.D.N.Y. 2005) (plaintiff could not meet "similarly situated" burden in claiming that police officer targeted her for a traffic ticket on the basis of her race by stating that the ticketing officer did not focus his attention on a white motorist that she believed was guilty of the same infraction).

Despite Plaintiffs' claim "that they were arrested for public disturbance when other non–Hispanic persons were not arrested" (Opp'n at 17), they point to no facts in the record that show other similarly–situated non–Hispanic individuals were treated differently with respect to noise and public–disturbance complaints. Plaintiffs identify no non–Hispanic individuals who were investigated for noise complaints but were not arrested, and their counsel agreed at oral argument that they are unable to do so. Defendants' motion for summary judgment on Count Four is therefore granted.

E.    Count Five: Connecticut State Constitution

Back–up Officers Bloom, D'Amato, Wolf, and Celentano move for summary judgment on Count Five of the Second Amended Complaint, which alleges violations of the Connecticut State Constitution through the use of excessive and unreasonable force and arrest without probable cause. They argue that they are entitled to summary judgment on

this Count for the same reasons that they are entitled to summary judgment on Plaintiffs'
Fourth Amendment false arrest and excessive force counts (Counts Two and Three,
respectively), that there is no evidence that they were present when Mr. Azana was arrested
or that they used excessive force against him, and that Mr. Azana's *nolo contendere* plea
defeats his false arrest claim.

As discussed above in Part II.B, in order to succeed on a false arrest claim under
either Connecticut law or Section 1983, Ricardo Azana must demonstrate that his
underlying criminal prosecution terminated in his favor, *Roesch*, 980 F.2d at 853, something
he is unable to do. Defendants' motion for summary judgment on Count Five as to the false
arrest claim is therefore granted.

As discussed above in Part II.C, Officers Bloom, D'Amato, and Celentano are entitled
to summary judgment on Plaintiffs' excessive force claim, however there exist genuine
disputes of material fact that preclude summary judgment in Officer Wolf's favor on this
claim. Defendants' motion for summary judgment on Count Five as to excessive force is
therefore granted with respect to Officers Bloom, D'Amato, and Celentanto, but denied with
respect to Officer Wolf.

F.    Count Six: Assault and Battery

In their Memorandum in Support, Defendants Bloom, D'Amato, Wolf, and
Celentano indicate that they move for summary judgment on Count Six of the Second
Amended Complaint,[2] which alleges assault and battery, but do not put forth an argument

---

[2] Page 10 of the Memorandum in Support reads: "The Defendants, Officers Michael
Wolf, Scott Bloom, Debra D'Amato, and Sergeant Ronald Celentano move for summary
judgment with respect to Counts I through X." (Mem. Supp. at 11.)

as to this count in the body of their memorandum.  Defendants' counsel clarified at oral argument that these back–up officers are entitled to summary judgment on Count Six because there is no evidence that any of them participated in the alleged beating of Ricardo Azana.

Ricardo and Yamileidi Azana do not claim, in the Second Amended Complaint, in their affidavits, or during their depositions, that anyone other than Officers Bogert and Morse actually hit Mr. Azana.  Unlike the Fourth Amendment's protections against excessive force, under which law enforcement officers have "an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers," *O'Neill*, 839 F.3d at 11, to prevail on a claim for assault and battery, a plaintiff "must prove that defendants applied force or violence to [him] and that the application of force or violence was unlawful," *Williams v. Lopes*, 64 F. Supp. 2d 37, 47 (D. Conn. 1999).  Although Mr. Azana testified that an officer that matches Officer Wolf's description stood just outside the door of his bedroom while Morse and Bogert beat him, there is no evidence that Officer Wolf, or Officers Bloom, D'Amato, or Celentano, actually applied any force to him.  These Defendants are therefore entitled to summary judgment in their favor on Count Six.

G.       Count Seven: Recklessness and Maliciousness

Back–up Officers Bloom, D'Amato, Wolf, and Sergeant Celentano move for summary judgment on Count Seven of the Second Amended Complaint, which alleges that Defendants were reckless and malicious in arresting, restraining, and assaulting Mr. Azana without legal or probable cause or justification, recklessly and wantonly using excessive and unreasonable force against Mr. Azana and failing or refusing to act to prevent each other

from using such force, and acting with the intent to inflict bodily injury and without any useful purpose for the arrest and detention of a criminal suspect.  They argue again that Mr. Azana's *nolo contendere* plea defeats his argument that he was arrested without probable cause, that there is no evidence that they were present when he was arrested or that they participated in any use of excessive force, and that there is no evidence that they observed the use of excessive force and were in a position to prevent it.

Again, as discussed above in Part II.B, Mr. Azana's *nolo contendere* plea defeats his false arrest argument, therefore Defendants Bloom, D'Amato, Wolf, and Celentano are entitled to summary judgment in their favor as to Count Seven with respect to Mr. Azana's "arrest without legal or probable cause" claim.

As discussed above in Part II.C, Officers Bloom, D'Amato, and Celentano are entitled to summary judgment on Plaintiffs' excessive force claim, however there exist genuine disputes of material fact that preclude summary judgment in Officer Wolf's favor on this claim.  Defendants' motion for summary judgment on Count Seven as to excessive force is therefore granted with respect to Officers Bloom, D'Amato, and Celentanto, but denied with respect to Officer Wolf.

H.    Count Eight: Negligence

All Defendants move for summary judgment on Count Eight of the Second Amended Complaint—which alleges negligence in the arrest of Mr. Azana without probable cause, the restraint and assault of Mr. Azana without justification or provocation, and the use of excessive force and the failure to prevent the use of excessive force against Mr. Azana—on the same grounds: that the *nolo contendere* plea precludes the false arrest claim

and that the back–up officers did not participate in and were not able to prevent any use of excessive force.  (Mem. Supp. at 25–26.)

For the same reasons discussed above in Parts II.B, II.C, II.F, and II.G, all Defendants are entitled to summary judgment on Count Eight as to the false arrest claim, Defendants Bloom, D'Amato, and Celentano are entitled to summary judgment on Count Eight as to the excessive force claims, but Defendants Bogert and Wolf are not entitled to summary judgment on Count Eight as to the excessive force claims.

I.      Count Nine: Negligent Infliction of Emotional Distress

All Defendants move for summary judgment on Count Nine of the Second Amended Complaint, which alleges negligent infliction of emotional distress in that "Defendant Officers knew or should have known that their acts and omissions, including intentionally calling the Department of Children and Families, involved an unreasonable risk of causing emotional distress to the Plaintiffs which was likely to lead to illness or bodily harm." Back–up Officers Bloom, D'Amato, Wolf, and Celentano argue that they are entitled to summary judgment on this count because they did not arrest Mr. Azana, did not assault him or witness an assault on him, and did not report the incident to DCF.  Officer Bogert argues that he is entitled to statutory immunity pursuant to Conn. Gen. Stat. § 17a-101e(b) with respect to his report to DCF because he had a good faith basis for making the report. Plaintiffs argue that there are genuine issues of material fact that preclude summary judgment on this count.

With respect to the back–up officers, once again, although Mr. Azana does not have a viable false arrest claim, and Bloom's, D'Amato's, and Celentano's absence from the scene of Mr. Azana's beating is not disputed, there exists a genuine factual dispute as to Officer

Wolf's presence and ability to prevent the use of excessive force against Mr. Azana.  The motion for summary judgment on Count Nine is therefore granted as to Defendants Bloom, D'Amato, and Celentano, and denied as to Defendant Wolf.

> With respect to Officer Bogert's argument, Conn. Gen. Stat. § 17a-101e(b) provides:
>
> Any person, institution or agency which, in good faith, makes, or in good faith does not make, the report pursuant to sections 17a-101a to 17a-101d, inclusive, and 17a-103 shall be immune from any liability, civil or criminal, which might otherwise be incurred or imposed and shall have the same immunity with respect to any judicial proceeding which results from such report provided such person did not perpetrate or cause such abuse or neglect.

Officer Bogert argues that because Mr. Azana was holding his minor child when the officers entered the bedroom, "it was reasonable for them to conclude that he was attempting to use the child as a shield to prevent them from arresting him."  (Mem. Supp. at 28.)  However, the differences between Officers Bogert's and Morse's version of the events and Mr. Azana's version of what happened in his bedroom preclude statutory immunity at the summary judgment stage.  Although the officers claim that he appeared to use his son as a human shield, Mr. Azana states in his affidavit that his son cried out to him when the officers broke into the bedroom and he picked him up to comfort him.  (Ricardo Azana Aff. ¶ 20.)  In fact, according to Mr. Azana, one of the officers "forcefully grabbed" his son and "threw him on the bed."  (*Id.* ¶ 21.)  If credited by a jury, Mr. Azana's claims with respect to his actions and the actions of the officers would tend to show that Officer Bogert did not have a good faith basis for reporting Mr. Azana to DCF.  Defendants' motion for summary judgment on Count Nine as to Officer Bogert is therefore denied.

J.       Count Ten: IIED

All Defendants move for summary judgment on Count Ten of the Second Amended Complaint, which alleges IIED on the basis of Defendants' actions, including calling DCF. Defendants Bloom, D'Amato, Wolf, and Celentano argue that they are entitled to judgment as a matter of law on this count because there is no evidence that they "committed any of the alleged acts that cause[d] the Plaintiffs' claimed emotional distress."  (Mem. Supp. at 29–31.) Officer Bogert argues again that he is entitled to statutory immunity for reporting Mr. Azana to DCF pursuant to Conn. Gen. Stat. § 17a-101e(b), and that Plaintiffs cannot show that the act of contacting DCF was extreme and outrageous.  Plaintiffs argue that there exist genuine issues of material fact as to the back–up officers' actions and that Officer Bogert is not entitled to statutory immunity.

In order to prevail on their IIED claim, Plaintiffs must show: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000).  Officers Bloom, D'Amato, and Celentano are entitled to summary judgment in their favor on Plaintiffs' IIED claim because there is no evidence that they were present during his alleged beating.  However, Ricardo Azana's account of Officer Wolf's actions—standing by and watching Officers Bogert and Morse beat Mr. Azana while failing to intervene or assist Mr. Azana in any way—if credited by a jury, reflects extreme and outrageous conduct.  Summary judgment is therefore denied as to Defendant Wolf on Count Ten.

25

With respect to Officer Bogert, as discussed above, there exist genuine issues of material fact as to whether his report to DCF was made in good faith. Similarly, if a jury were to credit the Azana's version of Bogert's actions in this respect—reporting Mr. Azana to DCF for taking actions to comfort and protect his child, while at the same time grabbing the minor child and throwing him forcefully to the bed—those actions constitute extreme and outrageous conduct. Summary judgment is therefore denied as to Defendant Bogert on Count Ten.

K.     Count Eleven: Monell Claim

Defendants West Haven Police Chief John Karajanis and the City of West Haven move for summary judgment on Count Eleven of the Second Amended Complaint, which alleges that Chief Karajanis and the City failed to promulgate and enforce appropriate guidelines, regulations, policies, practices, procedures, or customs regarding the actions by the individual Defendants. Chief Karajanis argues that he is entitled to summary judgment because he was not the Chief of Police of the West Haven Police Department on October 25, 2009. He states as much in his affidavit, and writes that he did not become Chief until February 26, 2010. (Karajanis Aff. ¶¶ 3–4.) Plaintiffs' counsel consented at oral argument to the dismissal of the claims against Chief Karajanis on this ground. Defendants' motion for summary judgment on Count Eleven as to Chief Karajanis is therefore granted.

The City argues that it is entitled to summary judgment on Count Eleven because there is no evidence that any policies, customs, or practices of the City led to any of the alleged constitutional deprivations in this case. A municipality may be liable under Section 1983 "for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or

decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). An official municipal policy or custom can be established by showing a deliberate policy of failing to train or supervise officers where that failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Anthony v. City of New York*, 339 F.3d 129, 140 (2d Cir. 2003) (citing *City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989)). Where there is no written directive or regulation that establishes the alleged policy of failing to train, it "may be inferred from the informal acts or omissions of supervisory municipal officials" where those acts are so severe as to "constitute 'gross negligence' or 'deliberate indifference' to a plaintiff's rights." *Sarus v. Rotundo*, 831 F.2d 397, 400–01 (2d Cir. 1987). A plaintiff must accordingly show:

> (1) that 'a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation'; (2) that 'the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation'; and (3) that 'the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.'

*Nicholson v. Scoppetta*, 344 F.3d 154, 166–67 (2d Cir. 2003) (quoting *Young v. County of Fulton*, 160 F.3d 899, 904–04 (2d Cir. 1998)).

Plaintiffs argue that there are genuine issues of material fact as to whether the City deliberately failed to provide training necessary to protect their constitutional rights. They point specifically to records provided by the City in discovery (Ex. E to Williams Aff. [Doc. # 71]), which they claim shows that the West Haven Police Department regularly responds to similar noise complaints, along with Officer Morse's statements in his deposition that West Haven officers are trained on "not so much the use of force but defensive tactics" (Morse Dep., Ex. B to Williams Aff. at 10:13–18) and that they "did various

27

things at the police academy but nothing specifically in crowd control type things" (*id.* at 27:13–28:2). This evidence does not establish any deficiencies in the training provided by the City that resulted in any of the alleged constitutional deprivations complained of by Plaintiffs. The City's motion for summary judgment on Count Eleven is therefore granted.

L.   Count Twelve: Conn. Gen. Stat. § 52-557n

Lastly, the City moves for summary judgment on Count Twelve of the Second Amended Complaint, which alleges that the City is liable under Conn. Gen. Stat. § 52-557n for the negligence of its agents. The City argues that it is entitled to qualified governmental immunity pursuant to Conn. Gen. Stat. § 52-557n(a)(2)(B).

Conn. Gen. Stat. § 52-557n(a)(1)(A) provides: "Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by . . . [t]he negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties." Section 52-557n(a)(2)(B) carves out an area of municipal immunity from this liability: "Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law."

There are three exceptions to this immunity: "first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain

28

laws . . . and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." *Purzycki v. Town of Fairfield*, 244 Conn. 101, 108 (1998).

Plaintiffs first argue that the City is not entitled to immunity pursuant to the third exception because Plaintiffs have alleged intentional and malicious acts, rather than mere negligence.  This argument misses the point, however, because although Plaintiffs allege malicious acts elsewhere in the Second Amended Complaint, Count Twelve is entitled "As to the City of West Haven *as for negligence* of its agents and employees pursuant to Conn. Gen. Stat. § 52-557n" (emphasis added) and specifically alleges that "[t]he Defendant Officers were negligent in the performance of their ministerial acts and duties."  (2d Am. Compl. ¶ 81.)

Plaintiffs also argue that the City is not entitled to immunity pursuant to the first exception, "because it was apparent to the Defendant Officers that the failure to act would subject the Plaintiffs to harm."  (Opp'n at 34–35.)  Plaintiffs have successfully highlighted disputed issues of material fact as to whether the individual officers were aware from the circumstances that their failure to act would likely subject Plaintiffs to harm.  As discussed above, there is evidence, in the form of Ricardo and Yamileidi Azana's affidavits and deposition testimony, that Officer Bogert beat Mr. Azana, and that Officer Wolf failed to intervene despite being present.  The City is therefore not entitled to summary judgment on Count Twelve.

III.    Conclusion

For the reasons stated above, Defendants' motion [Doc. # 60] is GRANTED in part and DENIED in part as follows:  Plaintiffs' claims in Count One against Defendants Bloom, D'Amato, and Wolf for their initial entry through the front door at 145 William Street are dismissed, however Plaintiffs' claims in Count One against Defendants Bloom, D'Amato, and Wolf for their entry into Plaintiffs' living room and Plaintiffs' claims in Count One against Defendants Bogert and Celentano remain for adjudication.  Count Two is dismissed as to all Defendants.   Count Three as to Defendants Bloom, D'Amato, and Sergeant Celentano is dismissed, however Count Three as to Defendants Bogert and Wolf remains for adjudication.   Count Four is dismissed.   Count Five is dismissed with respect to Plaintiffs' false arrest claims and their excessive force claims against Defendants Bloom, D'Amato, and Celentano, but remains for adjudication as to Plaintiffs' excessive force claims against Defendants Bogert and Wolf.   Count Six is dismissed as to Defendants Bloom, D'Amato, Wolf, and Celentano, but remains for adjudication as to Defendant Bogert.  Count Seven is dismissed with respect to Plaintiffs' false arrest claims and their excessive force claims against Defendants Bloom, D'Amato, and Celentano, but remains for adjudication with respect to Plaintiffs' excessive force claims against Defendants Bogert and Wolf.  Count Eight is dismissed with respect to Plaintiffs' false arrest claims and their excessive force claims against Defendants Bloom, D'Amato, and Celentano, but remains for adjudication with respect to Plaintiffs' excessive force claims against Defendants Bogert and Wolf.  Count Nine is dismissed as to Defendants Bloom, D'Amato, and Celentano, but remains for adjudication as to Defendants Bogert and Wolf.  Count Ten is dismissed as to Defendants

Bloom, D'Amato, and Celentano, but remains for adjudication as to Defendants Bogert and Wolf.  Count Eleven is dismissed.  Count Twelve remains for adjudication.


IT IS SO ORDERED.


        /s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 27th day of January, 2012.